**REVERSE and REMAND; Opinion Filed June 19, 2013.**



**In The**
**Court of Appeals**
**Fifth District of Texas at Dallas**

**No. 05-12-00534-CV**

**STEWART TITLE GUARANTY COMPANY, Appellant**
**V.**
**JOHN MIMS, LUCY MIMS, AND HELEN COTTON RAGLAND, INDIVIDUALLY**
**AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, Appellees**

**On Appeal from the 134th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. 10-14112**

## OPINION

Before Justices Bridges, Lang, and Lewis
Opinion by Justice Lang

This is an accelerated interlocutory appeal[1] from the trial court's order granting class certification in a case involving allegations that appellant Stewart Title Guaranty Company ("STGC") charged premiums for title insurance policies that exceeded the rates set by the Texas Department of Insurance ("TDI"). For the reasons below, we reverse the trial court's order granting class certification and remand this case to the trial court for further proceedings consistent with this opinion.

---

[1] *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(3) (West Supp. 2012); TEX. R. APP. P. 28.1.

# I. FACTUAL AND PROCEDURAL BACKGROUND

Appellees John and Lucy Mims ("the Mims") and Helen Cotton Ragland, individually and on behalf of all others similarly situated (collectively, "appellees"), filed this lawsuit against STGC on October 25, 2010.[2] In their petition, appellees asserted that in 2005, the Mims obtained a mortgage loan on their home and, at the closing of that mortgage loan, were required by their lender to purchase a "lender title policy" in the amount of the note on their home. Similarly, appellees asserted Ragland obtained a mortgage loan on her home in 2005 and was required by her lender to purchase a "mortgagee title policy" at the closing of that loan.

In 2006 and 2007, respectively, the Mims and Ragland refinanced their prior loans by obtaining new loans from different lenders. According to the petition, at the closing of those new loans, the Mims were required to purchase a "lender title policy" issued by STGC and Ragland was required to purchase a "Mortgagee title policy" issued by STGC. Appellees described those title policies as "reissue" title policies and asserted that because each such title policy was issued less than two years after the date of the "prior loan," STGC was required to "discount the basic premium charge for the reissue policy" pursuant to mandatory rates promulgated by the TDI. Specifically, appellees contended they were entitled to mandatory "reissue discounts" in accordance with TDI Rate Rule R-8, which provides in relevant part

> On a Mortgagee Policy, issued on a loan to fully take up, renew, extend or satisfy an old mortgage(s) that is already insured by a Mortgagee Policy(ies), the new policy being in the amount of the note of the new mortgage, the premium for the new policy shall be at the Basic Rate, but a credit shall reduce the premium by the following amount:

---

[2] Prior to filing this lawsuit, appellees filed a lawsuit based on the same facts in federal district court in Texas. *See Mims v. Stewart Title Guaranty Co*., 590 F.3d 298, 301–02 (5th Cir. 2009). In the federal lawsuit, appellees asserted a federal claim and the three state law claims alleged herein. *See id*. at 301, 307. The federal district court granted a motion certifying a class defined in terms essentially identical to those used in the order in question. *See id*. at 307. On appeal of the federal district court's class certification order, the Fifth Circuit reversed the district court's certification of appellees' federal claim and remanded the case for consideration of whether the district court should exercise pendent jurisdiction over the state law claims. *See id*. at 301, 308. Both sides assert in their appellate briefs in this Court that the federal district court ultimately dismissed the state law claims. However, no citation to the record is provided in support of those assertions. Further, while the record shows appellees' petition in this case states in a footnote that the federal district court's "dismissal order" was "entered September 14, 2010" and is attached thereto as "Exhibit A," the copy of the petition in the appellate record has no such exhibit attached.

(a)    40% of the premium calculated at the current rate on the written payoff balance of the old mortgage, such renewal occurring within two (2) years from the date of the Mortgagee Policy insuring the old mortgage.

*See* Basic Manual of Rules, Rates and Forms for the Writing of Title Insurance in the State of Texas, Section III, Rate Rules, R-8, http://www.tdi.texas.gov/title/titlemm3.html (last updated June 18, 2013).[3] Appellees asserted STGC did not give them the "required reissue rate discount under Texas law" and, thus, appellees were overcharged for title insurance.

Appellees stated in their petition that "[t]his class action is filed on behalf of all persons who, within seven years of the date of an existing mortgage on their residential real property in Texas, refinanced or otherwise replaced their existing first lien mortgage and were charged a premium for a new lender title insurance policy issued by [STGC], that exceeded the discounted reissue premium rates mandated by Texas law." Further, the petition stated "[t]he Class includes all such persons that closed a refinancing on or after June 15, 2003." Appellees asserted three causes of action: (1) money had and received, (2) unjust enrichment, and (3) breach of implied contract.

---

[3] Additionally, Rate Rule R-8 provides for credits against a title insurance premium in the following amounts:

> (b)   35% of the premium calculated at the current rate on the written payoff balance of the old mortgage, such renewal occurring more than two (2) years but less than three (3) years from the date of the Mortgagee Policy insuring the old mortgage;
> (c)   30% of the premium calculated at the current rate on the written payoff balance of the old mortgage, such renewal occurring more than three (3) years but less than four (4) years from the date of the Mortgagee Policy insuring the old mortgage;
> (d)   25% of the premium calculated at the current rate on the written payoff balance of the old mortgage, such renewal occurring more than four (4) years but less than five (5) years from the date of the Mortgagee Policy insuring the old mortgage;
> (e)   20% of the premium calculated at the current rate on the written payoff balance of the old mortgage, such renewal occurring more than five (5) years but less than six (6) years from the date of the Mortgagee Policy insuring the old mortgage;
> (f)   15% of the premium calculated at the current rate on the written payoff balance of the old mortgage, such renewal occurring more than six (6) years but less than seven (7) years from the date of the Mortgagee Policy insuring the old mortgage.

*Id*.

STGC filed a general denial answer and asserted twenty-nine "other defenses." Those defenses included, *inter alia*, waiver, estoppel, unclean hands, laches, and the statute of limitations.

On September 21, 2011, appellees filed a motion for class certification pursuant to Texas Rule of Civil Procedure 42. *See* TEX. R. CIV. P. 42. Appellees requested therein that the Mims and Ragland be appointed as class representatives on behalf of the following class:

> All persons who, within seven years of the date of an existing mortgage on their residential real property in Texas, refinanced or otherwise replaced their existing mortgage and were charged a premium for a new lender title insurance policy underwritten by [STGC], and did not receive a refinance credit, whose original mortgage also (1) had a GF number, (2) was returned to a title company, or (3) was a first lien in favor of an institutional lender. The class is limited to such persons who closed a refinancing on or after June 14, 2003.[4]

In their memorandum in support of their motion for class certification, appellees asserted in part

> The files maintained for the transactions are called "guaranty" or "GF" files. The file numbers are called "GF" numbers. The file will always contain the HUD-1, title commitment or the title report, title run, title policy and policy worksheet for the transaction. Each of these documents is maintained by Defendant's agents and can be provided for each GF number requested. . . . Defendant has a contractual right of access to the GF files from its independent agents. . . . [C]lass members and their damages calculations can be readily identified from the information in these records.

Additionally, appellees contended

> [STGC] provides guidance to its agents through bulletins and an on-line underwriting manual called Virtual Underwriter. [STGC's] agents . . . are required to follow [STGC's] guidelines. [STGC] has issued a bulletin to its agents concerning the applicability of Rate Rule R-8 that is available on-line on Virtual Underwriter. [STGC's] advisory instructs agents to assume that the refinanced mortgage was insured by a title policy (and the R-8 credit given) if "(1) it has a GF number, (2) it is returned to a title company or (3) it is first lien in favor of an institutional lender." Thus, if the title agent sees evidence in the file

---

[4] Excluded from the class described in appellees' motion for class certification were "(1) [STGC] and all directors, officers, agents and employees of [STGC]; (2) any person who has given a valid release of claims asserted in this suit; and (3) any person or entity who timely opts out of this proceeding." Further, appellees stated in their motion that "[t]he Class includes persons who paid for new lender title insurance policies on or after four years prior to the filing of the previous federal lawsuit."

–4–

that, at a minimum, any one of these conditions is satisfied, the R-8 credit is given without requiring other evidence of the prior policy. . . .

Finally, appellees stated that in response to a discovery request, STGC had provided appellees with a "sampling of files" pertaining to policies for which STGC's database showed no Rate Rule R-8 discount had been given. Appellees asserted that 121 of those policies were issued by TETRS, LLC ("TETRS"), the title agent involved in the Mims' refinancing transaction. Further, appellees stated

> Of those [121] files, nine were incomplete, perhaps due to photocopying errors. Of the 112 complete files, 73 should have received the discount, based on [STGC's] underwriting guidelines for the application of the R-8 credit and on Rate Rule R-8, but did not. The calculation of the reissue credit for each of these 73 files is set forth in a summary spread sheet at Appendix Exhibit 5-A. The spreadsheet illustrates how evidence supporting liability and damages can be presented at trial.

(footnotes omitted).

The appendix to appellees' memorandum in support of their motion for class certification consisted of sixty-two exhibits. Those exhibits included, in part, the "summary spread sheet" described by appellees; HUD-1 settlement statements[5] and various other documents pertaining to the refinancing transactions of six purported class members; an "Agent Advisory" issued by STGC to its agents that stated (1) agents "may assume" a refinanced mortgage was insured by a title policy if one of the three criteria described above is met and (2) "this bulletin does not establish mandatory procedures"; affidavits of the proposed class representatives and their attorneys; and excerpts from depositions of representatives of STGC and TETRS, including (1) testimony by Jamie Deal, a TETRS title insurance manager, that TETRS is "required to follow [STGC's] guidelines that it has provided for the issuance of title insurance policies," (2) testimony by STGC's designated representative, John Rothermel, that agents are "required to

---

[5] In their memorandum in support of their motion for class certification, appellees stated "HUD-1 Settlement Statements are standard, form documents used in each real-estate closing that identify loan information, including third-party charges, such as title insurance."

–5–

follow the rules and instructions contained in the manuals and bulletins furnished periodically and updated by [STGC]," and (3) testimony of Martha Hyman, an escrow manager for TETRS, that "in some circumstances" she has given a Rate Rule R-8 credit based upon the three criteria described above and "that would be consistent with the practice in Texas."

In its November 10, 2011 response to appellees' motion for class certification, STGC asserted in part "[t]here is no dispute that an individual who meets the requirements of Rate Rule R-8 is entitled to a reissue credit." However, STGC argued, "Texas class action law, like federal law, demands that Plaintiffs demonstrate that they can prove their claims and absent class members' claims based on common evidence that would predominate over individual issues at a trial." STGC contended in part that appellees "cannot show that they satisfy the predominance requirement of rule 42(b)(3)." Specifically, STGC stated "a file-by-file review of the putative class members' files will be required to determine whether each refinanced an existing mortgage within seven years and to determine whether any of the class-definition indicators are present." Further, STGC asserted

> Texas law, and the record in this case, demonstrate that individualized inquiries are required to determine whether any member of the putative class could prevail on the claims Plaintiffs seek to assert. . . . Quite simply, highly fact-specific, individualized evidence is required to determine whether each borrower paid the correct rate for title insurance in his or her particular refinancing transaction. To figure out whether a borrower qualified for a discount, what the various parties to each refinancing knew or were told about rate discounts, how they responded to that information, and whether the borrower paid for the lender's policy at issue would require discovery from hundreds of agents and others who are not parties to this action.

The appendix to STGC's response contained, *inter alia*, affidavits of title agents of STGC respecting determination of eligibility for the Rate Rule R-8 credit, including statements by several agents that (1) a GF number is not always evidence of a prior mortgagee policy because GF files are opened by agents in some instances without issuing a title policy; (2) a "return to title company stamp" does not mean a title policy was issued; (3) some institutional lenders do

not require title policies in some instances; (4) in transactions conducted by their agency, the satisfaction of any one, or all, of the three criteria enumerated in the class description does not necessarily mean that an applicant is considered eligible for a Rate Rule R-8 credit; and (5) the "title insurance policy from the mortgage being refinanced" or "the HUD-1 settlement statement" from the prior mortgage closing are the only documents that show if there was a prior lender's policy and those documents are not typically part of a guaranty file in a refinancing. Additionally, the appendix to STGC's response included various STGC documents and excerpts from depositions of STGC and TETRS representatives and the proposed class representatives.

Appellees filed a reply memorandum in support of their motion for class certification on December 19, 2011. In their reply memorandum, appellees contended in part

> [STGC's] Response implies that members of the putative class must "conclusively" prove the existence of the lender title policy issued on the prior mortgage. This premise is faulty in two different respects.
>     First, it assumes that Class members must prove that lender title policies were issued on the prior mortgages in order to recover. However, because [STGC] had . . . an internal policy requiring its agents to assume the existence of a lender's title policy on the prior mortgage if one of three indicators was present in the refinance file, the Class will ask the Court (via summary judgment), or the jury (via trial) to find that implied contracts arose between Class members and [STGC] for their purchase of lender title policies that not only required [STGC] to give the R-8 discount if Class members were eligible but to determine their eligibility pursuant to [STGC's] own eligibility guideline, even if that guideline presented a small potential for a handful of customers to receive the discount who did not have their prior mortgages covered by lender's title policies. Further, the Class will ask the Court or the jury to find that, pursuant to the causes of action for unjust enrichment and money had and received, [STGC] should pay over the amounts of R-8 discounts whenever [STGC's] underwriting guideline for giving the discount was met . . . .
>     Second, even if the Court and/or the jury finds that Class members must demonstrate the existence of a lender's title policy on the prior mortgage, [STGC's] premise that they must prove this "conclusively" is still faulty. As set forth below, proof of eligibility for the R-8 credit, like most facts in civil cases, need only be shown by a "preponderance of the evidence." Here, [STGC's] own guideline concedes that the prior mortgage was "more likely than not" insured by a lender's title policy if one of three types of circumstantial evidence is present in the refinance file. In other words, the jury can simply be asked if it is more likely than not that a lenders title policy was issued in connection with the prior mortgage refinanced by a Class member if the Class member's refinance file

–7–

contains one of these three different indicators. Once that question is answered, the existence of and breach of an implied contract and the entitlement of Class members to recover for unjust enrichment or money had and received will either be decided by the Court as a matter of law or be subject to classwide jury questions.

Appellees' reply restated their arguments described above respecting the "Agent Advisory" attached as an exhibit to their motion for class certification. Additionally, appellees asserted that at a "webinar" for STGC's agents in 2006, Richard Black, identified by appellees as senior Texas underwriting counsel for STGC, "instructed agents to assume that the existing lien is insured, absent knowledge to the contrary" with regard to Rate Rule R-8. Further, appellees stated that, in the "unlikely event" STGC is able to prove the existence of a class member subject to a limitations defense, appellees "will not assert the discovery rule on behalf of those Class members" and, therefore, "no individual issues will arise based upon [STGC's] alleged statute of limitations defense."[6]

Appellees' reply memorandum included an appendix containing, *inter alia*, settlement documents and deposition excerpts from other cases,[7] STGC form documents, and an excerpt from an undated document by "Richard L. Black, Senior Texas Underwriting Counsel."[8]

---

[6] With respect to STGC's defenses other than the statute of limitations, appellees filed a document titled "Special Exceptions, Motion to Dismiss and Motion for Affirmative and No Evidence Summary Judgment Regarding [STGC's] Defenses" on November 18, 2011. Therein, appellees requested, *inter alia*, summary judgment on twenty-two of STGC's twenty-nine defenses. Appellees contended in part that because STGC had the legal obligation to provide the rule R-8 discount to all eligible customers, any alleged knowledge or conduct of class members could not excuse STGC's failure to give the discount where it was due. Following a hearing on appellees' motion respecting STGC's defenses, the trial court signed a January 18, 2012 order granting appellees' motion for summary judgment and dismissing with prejudice the defenses addressed therein. On April 19, 2012, STGC filed a "Motion for Clarification or Reconsideration" of the trial court's order on appellees' motion respecting STGC's defenses. The record is silent as to the disposition of STGC's motion for clarification or reconsideration.

[7] STGC filed a January 19, 2012 objection to and motion to strike certain evidence submitted with appellees' reply memorandum in support of their motion for class certification on the ground that such evidence was taken from discovery in other cases and was irrelevant to the matters before the trial court. The record is silent as to the disposition of that motion.

[8] That excerpt stated as follows:

RATE RULE R-8: Refinance Credits. Under certain circumstances, one or more mandatory premium-credits may apply if a Mortgagee Policy or Policies are being issued in connection with a refinance loan transaction. The following conditions must be met in order for the Policy or Policies to qualify for the credit(s): a) The entire outstanding balance of the existing lien must be paid off in the refinance transaction; and b) each lien being refinanced must be covered by a Mortgagee Policy (but, in absence of actual knowledge that an existing lien is uninsured, the issuing title company must assume that the lien was insured, and it is NOT necessary for each existing lien to generate an actual credit).

The first of two hearings on appellees' motion for class certification was held on January 20, 2012. Both sides (1) presented arguments based on the evidence contained in the appendices of the motion, response, and reply described above and (2) introduced into evidence written summaries of their arguments with supporting documents from the appendices attached. Specifically, appellees presented evidence that (1) STGC's title agents are required to maintain files pertaining to the transactions in which they issue STGC policies and to provide those files to STGC and (2) STGC requires that the files maintained by its agents contain "the title evidence supporting the search, the examination, final report on the title"; the title insurance policy that was ultimately issued; the "HUD-1 settlement statement" from the closing of the refinancing transaction; and, to the extent such is issued, the title commitment. Appellees asserted "Schedule C from the title commitment" shows the date of the prior mortgage and whether the loan pertaining to that prior mortgage was from an institutional lender. Further, appellees (1) asserted that one "piece of evidence" that "may be in the file—is likely to be in the file" is the "prior mortgage," (2) contended the evidence showed that the first page of the "existing lien" of each purported class member will "have the GF number" from the prior transaction and will show "if it's returned to a title agent" and "whether it's an institutional lender on the prior loan," and (3) presented excerpts from Rothermel's deposition in which he testified he "would expect to see in a file that was appropriately prepared a copy of at least the first page, but perhaps the entirety" of the "existing lien." Finally, appellees explained to the trial court how they analyzed the "sample files" received by them through discovery to compile the "summary spread sheet," which contained the following categories of information: (1) "the GF number," (2) the date of the new loan, (3) the dollar amount of the new loan, (4) the dollar amount of the premium, (5) whether or not an institutional lender was involved in the prior transaction, (6) the date of the prior loan, (7)

the original balance of the old loan, (8) the payoff balance of the old loan, and (9) the dollar amount of the R-8 credit.

STGC introduced into evidence the title insurance files for the refinancing transactions of two purported class members. STGC argued, in part, that the evidence showed that most of the information needed to determine whether one of the "three indicators" listed in the proposed class definition is satisfied "is not computerized."

At the conclusion of that hearing, the trial court requested supplemental briefing on appellees' contention that class members were entitled to a Rate Rule R-8 credit based solely upon the presence of any one of the three "indicators" listed in the proposed class definition. STGC argued in part in its post-hearing briefs that application of such theory "would still require that individual inquires [sic] be made into the facts of each putative class member's transaction to determine whether an implied contract based on the three indicia alone was made."

Appellees contended in part in their post-hearing briefs

[STGC] argues that individual issues would predominate over common issues as to the existence of an implied-in-fact contract to give the R-8 discount whenever one or more of the three proxy indicators was present in a Class member's file. [STGC] is wrong. The evidence shows that these transactions happened in identical fashion—a borrower applied for a loan to refinance a preexisting loan, a lender required a lender's title policy, [STGC] was contacted and agreed to provide the lender's title policy at the legally required rate in return for payment of the premium by the borrower, and it had a policy of giving the R-8 discount whenever one or more of the three proxy indicators was present in a Class member's file.

A second hearing on appellees' motion for class certification was held on February 22, 2012. During that hearing, appellees requested, *inter alia*, that the trial court limit the class to persons refinancing first lien mortgages.

In a thirty-six page order dated April 4, 2012, the trial court granted appellees' motion for class certification. The trial court defined the class as follows:

–10–

All persons who, within seven years of the date of an existing first lien mortgage on their residential real property in Texas, refinanced or otherwise replaced their existing mortgage and were charged a premium for a new lender title insurance policy underwritten by [STGC], and did not receive a refinance credit, whose original mortgage also (1) had a GF number, (2) was returned to a title company, or (3) was a first lien in favor of an institutional lender. The class is limited to such persons who closed a refinancing on or after June 14, 2003.

The categories of persons excluded from the class were identical to those described as excluded in appellees' motion for class certification.

The trial court's order contained findings of fact that included, in part,

> [STGC] has a policy of giving the Rate Rule R-8 discount whenever one of three items is found in the underwriting file: whenever the original mortgage (deed of trust) (1) had a GF number, (2) was returned to a title company, or (3) was a first lien in favor of an institutional lender. . . . This policy is applicable to all of [STGC's] agents in the State of Texas. The evidence is disputed as to whether the policy is binding or permissive. . . .
> . . . .
> The three proxy indicators—whenever the original mortgage (deed of trust) (1) had a GF number, (2) was returned to a title company, or (3) was a first lien in favor of an institutional lender—are overwhelmingly predictive of, and therefore constitute prima facie evidence of, a prior insured mortgage. The fact that the three proxy indicators are predictive of a prior insured mortgage is necessarily evident from the fact that [STGC] has adopted a policy providing that its agents are either required to or may accept the three proxy indicators as sufficient evidence of a prior insured mortgage consistent with Texas law. . . .
> . . . .
> [STGC's] underwriting file will always contain the HUD-1 Statement, title commitment or the title report, title run, title policy and policy worksheet for the new transaction and a copy of the prior mortgage (deed of trust) being refinanced. From these documents, the presence of the three proxy indicators can be determined on an objective and ministerial basis.
> . . . .
> The foregoing demonstrates that it is a simple, accurate, objective, and ministerial task to (1) determine the existence of one or more of the three proxy indicators in the underwriting files; (2) determine whether the prior loan took place in the prior seven years; and (3) calculate the amount of the discount that should have been given. . . .
> Further, it is undisputed from the record that a HUD-1 settlement statement from the prior loan transaction, or the actual lender's title policy from the prior transaction, are definitive, objective, and indisputable proof of a prior insured mortgage. . . .

Additionally, the trial court described a "Litigation Plan" that included three "theories under which Plaintiffs and the Class members may present issues of liability to the jury": (1) the "Proxy Indicator Theory," (2) the "Circumstantial Prior Insured Mortgage Theory," and (3) the "Definitive Prior Insured Mortgage Theory." The trial court explained these three theories as follows:

[STGC] will produce to Plaintiffs all underwriting files for all persons who, on or after June 14, 2003, were charged a premium for a new lender title insurance policy underwritten by [STGC] under Rate Rule R-4 (i.e., persons who did not receive the Rate Rule R-8 discount in issue). Plaintiffs will review those files produced to determine whether they were refinancing of loans closed less than seven years earlier and contain one of more of the three proxy indicators and, thus, determine the members of the Class.

Because determination of whether the files contain one or more of the three proxy indicators is objective and ministerial, the Court expects that the parties will be able to stipulate to the identity of all or virtually all of the Class members. . . .

. . . .

Once class notice has been sent and the responses have been received from Class members, Plaintiffs' counsel will have two options as to how to proceed.

First, Plaintiffs may present to the jury questions predicating liability on the existence and breach of implied-in-fact contracts between Class members and [STGC] for [STGC] to provide the Rate Rule R-8 discount whenever one or more of the three proxy indicators . . . were present in Class members' underwriting files. Similarly, Plaintiffs may present the jury with liability questions on the unjust enrichment and money had and received causes of action which predicate liability based on [STGC's] failure to give the discount when Class members' underwriting files contained one or more of the three proxy indicators. Hereafter, the Court will refer to this theory of liability as the "Proxy Indicator Theory."

. . . .

The Court finds that Plaintiff could present evidence from which a jury could conclude that it is more likely than not that a prior mortgage was insured if one of the three proxy indicators is present in the file. Thus, the jury would additionally be asked whether the presence of one or more of the three proxy indicators in a Class member's underwriting file proves that there was, more likely than not, a lender's title policy on the prior loan (i.e., that the prior mortgage was insured). Based upon the question, the jury would be determining whether there was a prior insured mortgage for all Class members based on circumstantial evidence. . . . [STGC] would be entitled to put on general evidence regarding the reliability of the three proxy indicators.

. . . [T]he failure to give the Rate Rule R-8 discount by [STGC] when the condition of a prior insured mortgage, along with the other conditions of the Rate Rule R-8, was met makes [STGC] liable for breach of implied contract and/or unjust enrichment and/or money had and received. Since all the other conditions

–12–

of the Rule are included in the Class definition, they will have already been determined by the Court's identification of the Class members. Hereafter, the Court will refer to this as the "Circumstantial Prior Insured Mortgage Theory."

Second, and alternatively, Plaintiffs may choose to predicate liability on [STGC's] failure to provide a Rate Rule R-8 discount despite the existence of a prior insured title policy within seven years, as definitively evidenced by a HUD-l settlement statement and/or actual lender's title insurance policy from the prior transaction. . . . [I]f Plaintiffs elect to proceed under this theory, for every Class member for whom Plaintiffs can provide a HUD-1 settlement statement and/or actual lender's title insurance policy from a prior transaction occurring within seven years, then the Court will likely grant summary judgment with regard to those Class members. If need be, this evidence of the Class members for whom definite proof of a prior mortgage has been found can be presented to the jury in summary form.

If Plaintiffs proceed under this theory, after the Class members have been identified, Plaintiffs will attempt to obtain, by subpoena or otherwise, the HUD-1 settlement statements and/or prior insured title policies from the prior transactions. . . .

. . . .

. . . Hereafter, the Court will refer to this as the "Definitive Prior Insured Mortgage Theory."

In its conclusions of law, the trial court stated, in part, that it "finds it reasonable to conclude that the Class will consist of tens of thousands of members." Additionally, the trial court listed eleven "questions of fact or law common to Plaintiffs and all Class members."[9]

---

[9] The "questions of fact or law" listed by the trial court were as follows:

1. Whether implied-in-fact contracts arose between [STGC] and Class members to give the R-8 discount whenever one or more of the three proxy indicators was present in Class members' underwriting files?

2. Whether [STGC] breached such implied-in-fact contracts by failing to give the R-8 discount when one or more of the three proxy indicators was present in Class members' files?

3. Whether [STGC] is liable under the doctrine of unjust enrichment for failure to give the R-8 discount when one or more of the three proxy indicators was present in Class members' files?

4. Whether [STGC] is liable pursuant to the doctrine of money had and received for failure to give the R-8 discount when one or more of the three proxy indicators was present in Class members' files?

5. Whether the existence of one or more of the three proxy indicators in Class members' underwriting files proves, more likely than not, that Class members' prior mortgages were insured by lender's title policies?

6. Whether a HUD-1 Statement from the prior loan transaction showing the existence of a lender's title policy on the prior mortgage or the actual lender's title policy on the prior mortgage provides definitive, objective, and indisputable proof of the existence of a prior insured mortgage as required by Rate Rule R-8?

7. Whether implied-in-fact contracts arose between [STGC] and Class members to give Class members the R-8 discount whenever their prior mortgages were insured and the other conditions of Rate Rule R-8 were satisfied?

8. Whether [STGC] breached implied-in-fact contracts by failing to give the R-8 discount to Class members when their prior mortgages were insured and the other conditions of Rate Rule R-8 were satisfied?

–13–

Finally, as to predominance, the trial court concluded the requirements of "Rule 42(b)(3)" had been met and stated in part

> As identified above, all of the pertinent legal issues related to all three theories are common. While the issues of which of [STGC's] underwriting files contain one or more [of] the three proxy indicators and, possibly, which Class members have HUD-1 settlement statements or prior lenders' title insurance policies definitely proving the existence of prior insured mortgages must be determined individually, those issues can be determined by reference to objective criteria through an essentially ministerial review of standard form documents and, therefore, can be handled in a manageable, time efficient, and fair manner.

This interlocutory appeal timely followed.

## II. CERTIFICATION OF CLASS PURSUANT TO RULE 42

### A. *Standard of Review and Applicable Law*

Texas Rule of Civil Procedure 42 governs certification of class actions in Texas. *See* TEX. R. CIV. P. 42. We review the trial court's certification of a class action for an abuse of discretion. *Sw. Bell Tel. Co. v. Mktg. on Hold Inc.*, 308 S.W.3d 909, 915 (Tex. 2010). However, we do so "without indulging every presumption in favor of the trial court's decision." *Stonebridge Life Ins. Co. v. Pitts*, 236 S.W.3d 201, 204–05 (Tex. 2007) (citing *Henry Schein, Inc. v. Stromboe*, 102 S.W.3d 675, 691 (Tex. 2002); *Sw. Ref. Co., Inc. v. Bernal*, 22 S.W.3d 425, 434–35, 439 (Tex. 2000)). "Actual conformance with Rule 42 is indispensable, and compliance with the rule must be demonstrated, not presumed." *Id*. at 205.

"A trial court abuses its discretion when it: (1) acts arbitrarily or unreasonably; (2) does not properly apply the law to the undisputed facts; or (3) rules on factual assertions not supported by the record." *Doran v. ClubCorp. USA, Inc.*, 174 S.W.3d 883, 887 (Tex. App.—Dallas 2005,

---

9. Whether [STGC] is liable pursuant to the doctrine of unjust enrichment for failing to give the R-8 discount to Class members whose prior mortgages were insured and the other conditions of Rate Rule R-8 were satisfied?

10. Whether [STGC] is liable pursuant to the doctrine of money had and received for failing to give the R-8 discount to Class members whose prior mortgages were insured and the other conditions of Rate Rule R-8 were satisfied?

11. Whether the measure of damages for Class members who did not receive the R-8 discounts when they should have been given by [STGC] is the amount of the discounts not given?

no pet.) (involving review of order denying class action certification). "Under an abuse of discretion standard of review, our task is to make an independent inquiry of the entire record to determine if the trial court abused its discretion; we are not limited to reviewing the sufficiency of the evidence to support the findings of fact made or limited to the specific legal conclusions reached by the trial court." *Id.* "Thus, we do not review the trial court's findings of fact and conclusions of law separately from our analysis of whether the court abused its discretion in denying class certification." *Id.*

Pursuant to rule 42(a), "[a]ll class actions must satisfy four prerequisites: (1) numerosity—the class is so numerous that joinder of all members is impracticable; (2) commonality—there are questions of law or fact common to the class; (3) typicality—the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) adequacy of representation—the representative parties will fairly and adequately protect the interests of the class." *Citizens Ins. Co. of Am. v. Daccach*, 217 S.W.3d 430, 438 (Tex. 2007) (citing TEX. R. CIV. P. 42(a); *Bernal*, 22 S.W.3d at 435). In addition, a class action must satisfy at least one of the requirements in rule 42(b). *See id.*; *see also Compaq Computer Corp. v. Lapray*, 135 S.W.3d 657, 672 (Tex. 2004) ("[t]he class representatives bear the burden of establishing the prerequisites for class treatment"). In the case before us, appellees argue, and the trial court concluded, that the class action satisfies rule 42(b)(3), which requires that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members" and that class treatment be "superior to other available methods for the fair and efficient adjudication of the controversy." TEX. R. CIV. P. 42(b)(3). Rule 42(b)(3) contains a list of "nonexhaustive factors" to aid a court in determining if (b)(3) certification is appropriate: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation

concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the difficulties likely to be encountered in the management of a class action. *Daccach*, 217 S.W.3d at 439; *see* TEX. R. CIV. P. 42(b)(3)(A)–(D). Further, an order granting certification under rule 42(b)(3) must state, *inter alia*, "how the class claims and any issues affecting only individual members, raised by the claims or defenses asserted in the pleadings, will be tried in a manageable, time efficient manner." TEX. R. CIV. P. 42(c)(1)(D)(vii); *see Henry Schein, Inc.*, 102 S.W.3d at 689. A trial court must perform a "rigorous analysis" before ruling on class certification to determine whether all prerequisites to certification have been met. *Bernal*, 22 S.W.3d at 435. Further, to correctly determine certification issues, a certifying court must "understand the claims, defenses, relevant facts, and applicable substantive law." *Id.*

Because predominance is one of the most stringent prerequisites to class-action certification, it is considered first in our review. *Stonebridge Life Ins. Co.*, 236 S.W.3d at 205. The predominance requirement is intended to prevent class action litigation when the sheer complexity and diversity of the individual issues would overwhelm or confuse a jury or severely compromise a party's ability to present viable claims or defenses. *Id.* (citing *Henry Schein, Inc.*, 102 S.W.3d at 690; *Bernal*, 22 S.W.3d at 434). "Certification is not appropriate unless it is determinable from the outset that the individual issues can be considered in a manageable, time-efficient and fair manner." *Id.*; *see also Sw. Bell Tel. Co.*, 308 S.W.3d at 920. Predominance requires that common questions of law or fact will predominate over questions affecting only individual members. *Sw. Bell Tel. Co.*, 308 S.W.3d at 920. "The test for predominance is not whether common issues outnumber uncommon issues but . . . whether common or individual issues will be the object of most of the efforts of the litigants and the court." *Id.* (quoting *Bernal*, 22 S.W.3d at 434 (internal quotations omitted)); *see also Stonebridge Life Ins. Co.*, 236 S.W.3d

at 205. "To evaluate predominance, we identify the substantive issues that will control the litigation, assess which issues will predominate, and determine if the predominating issues are, in fact, those common to the class." *Stonebridge Life Ins. Co.*, 236 S.W.3d at 205 (citing *Bernal*, 22 S.W.3d at 434).

"Because Rule 42 is patterned after Federal Rule of Civil Procedure 23, federal decisions and authorities interpreting current federal class action requirements are instructive." *Riemer v. State*, 392 S.W.3d 635, 639 (Tex. 2012) (citing *Bernal*, 22 S.W.3d at 433 ("federal decisions and authorities interpreting current federal class action requirements are persuasive authority")).

### *B. Analysis*

STGC asserts eleven issues on appeal.[10] We begin with STGC's third issue, in which it contends the trial court abused its discretion by granting appellees' motion for class certification because the predominance requirement of rule 42(b)(3) was not met. In support of its argument on this issue, STGC cites *Ahmad v. Old Republic National Title Insurance Co.*, 690 F.3d 698

---

[10] The issues asserted by STGC are as follows:

1. Is the Class Certification Order based on Findings of Fact that are contradicted by the undisputed record?

2. Is the Class Certification Order based on a common question that can be answered "in one stroke," as required by Rule 42(a), as opposed to a series of questions that must be answered individually as to each putative class member?

3. Do common issues predominate over individual issues on Plaintiffs' putative claims, as required by Rule 42(b)(3)?

4. Did the trial court commit reversible error by certifying a class on Plaintiffs' claim for implied contract?

5. Did the trial court commit reversible error by certifying a class on Plaintiffs' claim for money had and received?

6. Did the trial court commit reversible error by certifying a class on Plaintiffs' claim for unjust enrichment?

7. Did the trial court abuse its discretion by approving the use of three "proxy indicators" rather than requiring evidence of actual compliance with Rate Rule R-8?

8. Is the trial court's Litigation Plan unmanageable?

9. Did the trial court abuse its discretion by allowing Plaintiffs' counsel the option of changing the theory of the case after class certification?

10. Did the trial court commit reversible error by limiting STGC to putting on "general evidence" to rebut the "proxy indicators" theory?

11. Do STGC's statute of limitations and/or laches defenses raise individualized issues that demonstrate lack of predominance under Rule 42(b)(3)?

(5th Cir. 2012), a case decided subsequent to the trial court's order in question and after the parties in the case before us filed their initial briefs in this Court.[11]

*Ahmad* involved a putative class action initiated in federal district court in Texas by Gary and Mirvat Ahmad (the "Ahmads") against Old Republic National Title Insurance Company ("Old Republic") based on allegations that Old Republic charged premiums for title policies that exceeded the refinance rates in TDI Rate Rule R-8. *Id*. at 699. The Ahmads asserted, in part, state claims for breach of implied contract, unjust enrichment, and money had and received.[12] *Id*. at 699–700. They filed a motion for class certification pursuant to Federal Rule of Civil Procedure 23(b)(3)[13] in which they requested certification of a proposed class defined as "[a]ll persons who, within seven (7) years of the date of an existing mortgage on their residential real property in Texas, refinanced or otherwise replaced their existing mortgage and were charged a premium for a new lender title insurance policy underwritten by Defendant Old Republic National Title Insurance Company, that exceeded the discounted reissue premium rates mandated by Texas law." The Ahmads argued class certification was appropriate because the transactions at issue "involve standard, form documents" and "[c]lass members and their damages can be identified and determined using objective criteria based on Defendant's business records." *Id*. at 700. They maintained that such evidence could be summarized easily because it is an "established practice" in Texas "to assume that the refinanced mortgage was insured by title policy (and give the R–8 credit) if '(1) it has a GF number, (2) it is returned to a title company or (3) it is [a] first lien in favor of an institutional lender.'" *Id*. According to the Ahmads, each of

---

[11] Subsequent to the Fifth Circuit's opinion in *Ahmad*, STGC filed a reply brief in this Court in which it addressed the Fifth Circuit's holding. Additionally, appellees filed a "Sur-Reply Brief" in this Court specifically addressing *Ahmad* and STGC filed a "Response to Appellees' Sur-Reply Brief."

[12] Additionally, the Ahmads asserted a federal claim alleging violation of the Real Estate Settlement Procedures Act("RESPA"). *Id*. at 700. The federal district court granted summary judgment in favor of Old Republic as to that claim. *Id*.

[13] The wording of Federal Rule of Civil Procedure 23(b)(3) is virtually identical to that of rule 42(b)(3) of the Texas Rules of Civil Procedure. *See* FED. R. CIV. P. 23(b)(3); TEX. R. CIV. P. 42(b)(3).

these three "proxy indicators" is sufficient to demonstrate that a policy was issued insuring the prior mortgage and to show that the borrower is entitled to the R–8 credit. *Id*. Additionally, the Ahmads proposed eleven "questions of fact or law common to the class."[14]

In response, Old Republic denied that any of the three "proxy indicators" is "legally sufficient" to establish a borrower's entitlement to the Rate Rule R–8 credit. *Id*. Also, Old Republic disputed the Ahmads' contention that evidence necessary to show liability and damages could be easily summarized, noting that (1) the guaranty files are not stored centrally by Old Republic, but rather by numerous individual agents throughout the state; (2) much of the information is not available electronically; (3) where information is available electronically, it is not easily compiled because different agents use different programs for electronic filing; and (4) in most, if not all cases, the guaranty file for the refinance transaction will not contain a copy of the prior mortgage policy. *Id*.

The district court granted certification of a class consisting of all persons in the proposed class whose guaranty file for the refinance transaction contained one of three "proxy indicators."

---

[14] The Ahmads' proposed common questions were as follows:

1. Whether the plaintiff refinanced an existing mortgage within seven (7) years after the closing of the existing mortgage;

2. Whether the plaintiff qualified for the mandatory reissue discount in connection with the reissue lender title policy;

3. What evidence is sufficient to qualify a borrower for the R–8 credit;

4. The dollar amount of the reissue discount required to be applied to the plaintiff's transaction;

5. Whether Defendant or its agents could "earn" or lawfully keep the amount of the R–8 credit not given to eligible borrowers;

6. Whether Defendant split the unearned discounts with its agents;

7. Whether Defendant's splitting of the unearned premiums with title agents violated Section 8(b) of RESPA;

8. Whether the circumstances of each borrower's purchase of a lender title policy gives rise to implied contracts requiring Defendant to issue a policy at the lawful rate;

9. Whether Defendant breached the implied contracts with class members by not giving the mandatory R–8 credit;

10. Whether Defendant breached other legal duties to class members by failing to give them the discounted reissue premium rates mandated by Texas law and retaining those unearned premiums; and

11. Whether plaintiffs and the class are entitled to recover three times the amount charged for the reissue lender title insurance policies, pursuant to 12 U.S.C. § 2607(d)(2).

*Id*. at 700–01. Further, the district court identified questions number 2, 3, 5, and 10 of the Ahmads' eleven proposed "common questions" as being "common to the class" and concluded common questions would predominate over individual issues. *Id*. at 701. Old Republic filed an appeal to the Fifth Circuit challenging the district court's "finding" that the plaintiffs had satisfied the predominance requirement of rule 23(b)(3). *Id*. at 703.

The Fifth Circuit reversed the district court's order granting class certification. *Id*. at 705. In its analysis, the Fifth Circuit noted that on the same day the district court rendered its order granting the Ahmads' motion for class certification, the Fifth Circuit issued *Benavides v. Chicago Title Insurance Co*., 636 F.3d 699 (5th Cir. 2011), affirming denial of class certification on similar facts. *Id*. at 701. In the *Ahmad* decision, the Fifth Circuit stated

> The *Benavides* district court found that while the questions were "common in the colloquial sense," none could be "definitively answered for all class members using a generalized set of facts and producing one unified conclusion." The resulting trial would require the factfinder to determine whether each individual qualified for the discount based on the evidence in his or her file—"[i]n some cases the answer [would] be 'yes' and in others 'no.'" On appeal, this court affirmed, approving the district court's denial of class certification because "[t]he only issues to be determined are . . . individualized inquiries as to whether particular persons qualify for the discount and were denied it."

*Id*. at 703 (footnotes omitted). Then, the Fifth Circuit turned to the question of "whether the predominant issues here differ from those in *Benavides* and, if so, whether they are capable of class-wide determination." *Id*.

First, the Fifth Circuit addressed the Ahmads' question number three, which stated "What evidence is sufficient to qualify a borrower for the R–8 credit." *Id*. at 704. The Fifth Circuit stated the district court had "mistakenly characterized question 3 as a 'common question' of fact." *Id*. Specifically, the Fifth Circuit stated in part

> [T]he answer to question 3 will not "resolve an issue that is central to the validity of each one of the claims in one stroke." [quoting *Wal-Mart Stores, Inc. v. Dukes*, — U.S. —, 131 S.Ct. 2541, 2551 (2011)]. Even if the proxy indicators constitute evidence from which a reasonable jury could conclude that a

borrower's original mortgage was insured, the jury will have to engage in file-by-file review to determine whether individual plaintiffs had original mortgages covered by title insurance and met the other R–8 criteria.

*Id*.

Second, the Fifth Circuit addressed the district court's reasoning that questions number two, five, and ten were "common to the class." *Id*. at 705. The Fifth Circuit noted, without discussion, that "in *Benavides*, this court affirmed that issues virtually identical to questions 2 and 10 were not capable of class-wide determination by class-wide proof."[15] Additionally, the Fifth Circuit reasoned

> As Old Republic notes, question 5—"Whether Defendant or its agents could 'earn' or lawfully keep the amount of the R–8 credit not given to eligible borrowers"—presupposes that "the R–8 credit not given" was required to be given. Question 5 thus is dependent on the resolution of question 2. In other words, question 5 presupposes the resolution of a question that cannot be answered on a class-wide basis with class-wide proof. Therefore, like questions 2, 3, and 10, question 5 is not a "common question."

*Id*. The Fifth Circuit agreed with Old Republic that "there is no meaningful distinction between the class certification issues in this case and those in *Benavides*." *Id*. at 704. The court concluded "[b]ecause none of the four questions identified by the district court is actually common to the class, common questions will not predominate at trial, and the Ahmads were not entitled to class certification under Rule 23(b)(3)." *Id*. at 705.

---

[15] Questions number two and ten in *Ahmad* were virtually identical to questions number two and six, respectively, on the list of "purported questions common to the class" in *Benavides*. *See Benavides*, 636 F.3d at 701. As described above, the Fifth Circuit concluded in *Benavides* that the only issues to be determined were "individualized inquiries as to whether particular persons qualify for the discount and were denied it." *See id*. at 703; *see also Hancock v. Chicago Title Ins. Co*., 263 F.R.D. 383, 390 (N.D. Tex. 2009); *aff'd sub nom. Benavides v. Chicago Title Ins. Co*., 636 F.3d 699 (5th Cir. 2011) (concluding Benavides' proposed questions "amount to a case-by-case inquiry to identify and calculate overcharges").

1. Predominance Under "Proxy Indicator" Theory

We begin with STGC's contention that, in the event the case proceeds as a class action under the "proxy indicator" theory, common questions will not predominate.[16] Specifically, STGC argues in part

> As to the implied contract claim, there will be individual issues as to what (if any) offer was communicated and what (if anything) was accepted. There will also be individual issues as to the terms of any putative implied contract. Given that STGC Agents could only have entered into these implied contracts by reaching a "meeting of the minds" with each putative class member, STGC's showing that different Agents knew and employed various factors in various locations to attempt to determine whether a prior mortgage was insured, establishes that what (if anything) was agreed upon will vary from claimant to claimant.

(citations to record omitted). Further, STGC asserts (1) the "Agent Advisory" issued by STGC is "***not*** a 'policy,'" (2) "[i]t is ***undisputed*** **that Agents are *not* required to follow the Advisory guidelines**," (3) "there is ***no*** evidence in the record that application of the Advisory guidelines is 'binding'" and (4) "the record conclusively demonstrates that Agents have varying practices with respect to what they rely upon to satisfy themselves that a prior lender's policy existed." (emphasis original). Finally, STGC argues "[t]he analysis is the same" for appellees' unjust enrichment and money had and received claims.

Appellees state in their brief in this Court that STGC's Agent Advisory "instructs agents to assume that the refinanced mortgage was insured by a title policy (and the R-8 credit given)" if any one of the three "proxy indicators" is satisfied. Thus, appellees assert, "if the title agent sees evidence in the file that any one of these conditions is satisfied, the R-8 credit is to be given without requiring other evidence of the prior policy." Further, according to appellees,

> The Class asserts that the basic common facts of their transactions give rise to an implied contract claim. In each transaction, a Class member purchased a lender title insurance policy insuring the refinancing lender, as a condition of the closing of the loan. This fact, uniform in each transaction, in the context of the [TDI]

---

[16] *See* "Proxy Indicator Theory" description in trial court's order, *supra* Part I.

guidelines and regulations, gives rise to an obligation on the part of [STGC], through its direct and independent agents, to issue a lender title insurance policy insuring the lender at the lawful mandatory rate, including the refinance credit. Similarly, the facts that [STGC] had a guideline governing when the R-8 discount should be given and that there is an identical standard practice are facts common to all Class members in deciding upon the terms of the implied contracts.

As to unjust enrichment, appellees contend STGC "mischaracterizes the relevant inquiry necessary to adjudicate this claim on a class-wide basis." Appellees argue that "[i]nitially, either the Court or the jury will answer the class-wide question of whether it was unconscionable for Appellant to retain the amount of the R-8 discount not given to Class members whose refinance files contain one of the three indicators set forth in Appellants' underwriting guidelines." Additionally, with respect to money had and received, appellees assert "[t]he common questions to be resolved by the Court and/or jury in regard to money had and received will be very similar to those submitted in connection with unjust enrichment." On appeal, appellees do not specifically describe the premise for their unjust enrichment and money had and received claims under the "proxy indicator" theory. However, the record shows that those claims, like the implied contract claim under the "proxy indicator" theory, are premised on appellees' assertion that STGC's Agent Advisory "instructs agents to assume that the refinanced mortgage was insured by a title policy (and the R-8 credit given)" if any one of the three "proxy indicators" is satisfied.[17] Appellees contend questions number one through four in the trial court's order pertain to the "proxy indicator" theory.

---

[17] The record shows, *inter alia*, that at the first hearing in the trial court, counsel for appellees argued as follows:

The jury is initially going to be asked whether [STGC] received a benefit that would be unconscionable for it to retain in the form of the R-8 discount not given to a class member if one of three items was present in a class member's underwriting file. Again, why could the jury find that it would be unconscionable under those circumstances? Well, the jury would have heard that it's a mandatory discount. . . . So with that evidence in front of a jury, could a jury find it's unconscionable as required by unjust enrichment—that they were unjustly enriched if they didn't give it when one of these items was present?

. . . .

And I'm not going to go through the whole thing, but again, it's the exact same analysis, Your Honor, with money had and received and unjust enrichment. Again, the jury can find that the money of the discount not given is money which in equity and good conscience should be returned whenever one of those three things were present given the evidence that we're going to be presenting.

–23–

The record shows (1) Deal, a TETRS title insurance manager, testified TETRS is "required to follow [STGC's] guidelines that it has provided for the issuance of title insurance policies" and (2) Rothermel, STGC's designated representative, testified agents are "required to follow the rules and instructions contained in the manuals and bulletins furnished periodically and updated by [STGC]." However, the Agent Advisory issued by STGC stated (1) agents "may assume" that a refinanced mortgage was insured by a title policy if one of the three "proxy indicators" was satisfied and (2) "this bulletin does not establish mandatory procedures." Thus, the only guideline, rule, or instruction in the Agent Advisory is that an agent "may assume" a prior title insurance policy existed in certain circumstances. We conclude there is no evidence in the record that, as asserted by appellees, STGC's Agent Advisory "instructs agents to assume that the refinanced mortgage was insured by a title policy (and the R-8 credit given)" if any one of the three "proxy indicators" is satisfied. Additionally, the record contains affidavit testimony of several STGC title agents that in transactions conducted by their agency, the satisfaction of any one, or all, of the three "proxy indicators" does not necessarily mean that an applicant is considered eligible for a Rate Rule R-8 credit.

An implied-in-fact contract "arises from the acts and conduct of the parties, it being implied from the facts and circumstances that there was a mutual intention to contract." *Haws & Garrett Gen. Contractors, Inc. v. Gorbett Bros. Welding Co.*, 480 S.W.2d 607, 609 (Tex. 1972); *accord Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 850 (Tex. 2009). A meeting of the minds is an essential element of an implied-in-fact contract. *Tex. Ass'n of Counties Cnty. Gov't Risk Mgmt. Pool v. Matagorda Cnty.*, 52 S.W.3d 128, 133 (Tex. 2000).

Additionally, in their post-hearing briefing requested by the trial court on the "proxy indicator" theory, appellees asserted in part

As to unjust enrichment and money had and received (implied-law contracts), given that [STGC] must necessarily decide whether to give the R-8 discount based upon circumstantial evidence, and given that it has a policy and practice of giving the R-8 discount whenever one of the three proxy indicators is present in a customer's file, a jury could reasonably find that [STGC] was unjustly enriched and holds money which, in equity and good conscience, should be returned whenever it failed to give the R-8 discount despite the presence of one or more of the three proxy indicators in a Class member's file.

The court must look to the conduct of the parties to determine the terms of the contract on which the minds of the parties met. *Parker Drilling Co. v. Romfor Supply Co.*, 316 S.W.3d 68, 75 (Tex. App.—Houston [14th Dist.] 2010, pet. denied); *Wal-Mart Stores, Inc. v. Lopez*, 93 S.W.3d 548, 557 (Tex. App.—Houston [14th Dist.] 2002, no pet.). The determination of a meeting of the minds is based on the objective standard of what the parties said and did, not on their subjective states of mind. *Parker Drilling Co*., 316 S.W.3d at 75; *Lopez*, 93 S.W.3d at 557.

Unjust enrichment and money had and received are examples of quasi-contract theories. *See Fortune Prod. Co. v. Conoco, Inc*., 52 S.W.3d 671, 684 (Tex. 2000); *Merry Homes, Inc. v. Luc Dao*, 359 S.W.3d 881, 883 (Tex. App.—Houston [14th Dist.] 2012, no pet.). A quasi-contract, or a "contract implied in law," is "not a contract at all but an obligation imposed by law to do justice even though it is clear that no promise was ever made or intended." *Bank of Am. v. Jeff Taylor LLC*, 358 S.W.3d 848, 856 (Tex. App.—Tyler 2012, no pet) (quoting *Fortune Prod. Co.*, 52 S.W.3d at 684). Unjust enrichment occurs when the person sought to be charged has wrongfully secured a benefit or has passively received one that it would be unconscionable to retain. *Villareal v. Grant Geophysical, Inc*., 136 S.W.3d 265, 270 (Tex. App.—San Antonio 2004, pet. denied). "To prove a claim for money had and received, a plaintiff must show that a defendant holds money which in equity and good conscience belongs to him." *MGA Ins. Co. v, Charles R. Chesnutt, P.C*., 358 S.W.3d 808, 814 (Tex. App.—Dallas 2012, no pet.); *accord Edwards v. Mid–Continent Office Distrib., L.P*., 252 S.W.3d 833, 837 (Tex. App.—Dallas 2008, pet. denied).

As described above, the trial court stated in its order that under the "proxy indicator" theory, liability for breach of implied contract is predicated on the existence of "implied-in-fact contracts between Class members and [STGC] for [STGC] to provide the Rate Rule R-8 discount whenever one or more of the three proxy indicators . . . were present in Class members'

underwriting files." On this record, we conclude that determining STGC's liability for breach of implied contract under the "proxy indicator" theory would require an examination by the jury as to whether each putative class member agreed to the implied contract appellees posit. *See Lopez*, 93 S.W.3d at 557 (inquiry as to existence of implied contracts between Wal-Mart managers and employees in class action lawsuit would necessarily involve individual inquiries into what each class member and manager said and did). Therefore, we conclude individual issues will predominate over any common issues as to that determination. *See id*.; *see also Gene & Gene LLC v. Biopay LLC*, 541 F.3d 318, 328–29 (5th Cir. 2008) (class certification improper where "mini-trials" would be required to establish liability).

Similarly, as stated above, appellees' claims for unjust enrichment and money had and received under the "proxy indicator" theory are based on appellees' assertions that STGC's Agent Advisory "instructs agents to assume that the refinanced mortgage was insured by a title policy (and the R-8 credit given)" if any one of the three "proxy indicators" is satisfied. We concluded above these assertions are not supported by the record. Appellees do not explain, and the record does not show, how, in the absence of such a requirement, those claims present any "common questions." *Cf. Ahmad*, 690 F.3d at 705 (generally stating that question that "presupposes the resolution of a question that cannot be answered on a class-wide basis with class-wide proof" is not "common question"); *Hancock v. Chicago Title Ins. Co.*, 263 F.R.D. 383, 388, 390 (N.D. Tex. 2009); *aff'd sub nom. Benavides v. Chicago Title Ins. Co.*, 636 F.3d 699 (5th Cir. 2011) (question asking "[w]hether Defendant breached other legal duties to class members by failing to give them the reissue discount mandated by Texas Law and retaining those unearned premiums" was not common question).

## 2. Predominance Under "Circumstantial Prior Insured Mortgage" Theory

Next, we consider STGC's contention that common questions will not predominate on any of appellees' claims under the "circumstantial prior insured mortgage" theory.[18] STGC asserts "[t]he Fifth Circuit squarely rejected this precise theory in *Ahmad*." Further, STGC argues that obtaining the necessary information regarding the three "proxy indicators" in this case poses "insurmountable manageability issues" because it would require securing files from hundreds of agents and lenders "involved in the putative class members' *prior* transactions." (emphasis original).

Appellees assert question number five in the trial court's order "provides the underpinnings" for the "circumstantial prior insured mortgage" theory.[19] Question number five reads as follows: "Whether the existence of one or more of the three proxy indicators in Class members' underwriting files proves, more likely than not, that Class members' prior mortgages were insured by lender's title policies?" According to appellees, question number five "can be definitively answered for all class members using a generalized set of facts and producing one unified conclusion, making it a common question." In their sur-reply brief in this Court, appellees distinguish *Ahmad* as follows:

> [B]ecause the litigation plan for this case is different from the plan in *Ahmad*, the questions in *Ahmad* found by the Fifth Circuit not to be common are different from the questions found to be common by the trial court in this case and, crucially, the questions found to be common in this case by the trial court are, indeed, common.

Further, appellees argue

> [T]here is significant common evidence regarding the reliability of these proxy indicators as proof of a prior insured mortgage. And . . . since the class definition is limited to persons whose files contain one or more of the three proxy indicators,

---

[18] *See* "Circumstantial Prior Insured Mortgage Theory" description in trial court's order, *supra* Part I.

[19] Additionally, appellees assert (1) questions number seven through ten constitute the "liability questions" for this theory and "would be answered" if question number five were answered affirmatively and (2) question number eleven addresses the measure of damages to be applied.

the only individual file review necessary would be to identify class members, which does not prevent commonality and predominance and, thus, does not prevent class certification.

(citations to record omitted).

In support of their argument, appellees cite *Southwestern Bell Telephone Co. v. Marketing on Hold Inc.*, 308 S.W.3d 909 (Tex. 2010), and *Young v. Nationwide Mutual Insurance Co.*, 693 F.3d 532 (6th Cir. 2012), a federal case decided approximately one month after *Ahmad.* In *Southwestern Bell*, an auditor of phone bills, Marketing on Hold Inc. d/b/a Southwest Tariff Analyst ("STA"), brought a class action as a customer's assignee against Southwestern Bell Telephone Company. STA alleged Southwestern Bell improperly charged some of its business customers certain municipal fees. *Id.* at 914. Claims asserted by STA included breach of contract, unjust enrichment, breach of express warranty for services, and negligence per se. *Id.* The trial court certified the proposed class and the court of appeals affirmed the trial court's order. *Id.* On appeal to the supreme court, Southwestern Bell argued, in part, that the predominance requirement of rule 42(b)(3) had not been met because several claims allegedly would require individualized proof of reliance and the assessment of damages would require individualized review of bills and other records. *Id.* at 915. The supreme court concluded "class-wide evidence" as to reliance "exists in the form of customer bills upon which customers must have relied to determine the initial amount due and owing." *Id.* at 923. Therefore, the court concluded, the trial court did not abuse its discretion in finding that individual issues of liability will not predominate over common issues at trial. *Id.* With respect to damages, Southwestern Bell contended the computer program approved by the trial court to calculate damages could not accurately assign damages to particular class members in a timely and efficient manner because "each class member must be investigated to determine if she actually paid each of the bills at issue." *Id.* at 924. The supreme court stated "proof of

ownership and payment may be efficiently determined through proof-of-claim forms or some other vehicle." *Id*. at 924–25. Further, the supreme court reasoned that (1) the trial court stated it would "inquire into additional technical means of identifying and notifying unidentified class members, such as a search of the records of the Secretary of State's Office" and (2) evidence at the certification hearing established that at least twenty-five percent of the class members are current Southwestern Bell customers and Southwestern Bell produced a list of putative class members that identified thirty percent of them by name. *Id*. at 925. Therefore, the supreme court concluded, damage issues would not "consume the focus of the litigation" and the predominance requirement of rule 42(b)(3) had been met. *Id*.

*Young* involved a proposed class action by insurance policyholders in Kentucky alleging insurers charged them a local government tax on their premiums when such tax was not owed or the tax amount owed was less than the insurer billed. *See* 693 F.3d at 535. The policyholders asserted claims against the insurers for illegal dealing in premiums, negligence, conversion, and declaratory relief. *Id*. The district court certified the class and the insurers appealed. *Id*. On appeal, the insurers argued, in part, that predominance was precluded because plaintiffs "cannot establish the causation element of their claims without reviewing the communications between each policyholder and insurance agent to decipher where the error originated." *Id*. at 544. The Sixth Circuit observed that plaintiffs planned to "proceed on the theory that verification processes using geocoding software would catch most types of errors and that Defendants caused each class member's injury simply by failing to use such processes." *Id*. The Sixth Circuit concluded, in part, "this is a predominate [sic] issue central to each of Plaintiffs' claims and subject to generalized proof." *Id*. Therefore, the Sixth Circuit concluded, "[t]hese potential individual inquiries do not defeat the predominance of common questions." *Id*.

In the case before us, the trial court's findings of fact stated in part

> [STGC's] underwriting file <u>will always contain</u> the HUD-1 Statement, title commitment or the title report, title run, title policy and policy worksheet for the new transaction and a copy of <u>the prior mortgage (deed of trust)</u> being refinanced. From these documents, the presence of the three proxy indicators can be determined on an objective and ministerial basis.
>
> . . . .
>
> The foregoing demonstrates that it is a simple, accurate, objective, and ministerial task to (1) determine the existence of one or more of the three proxy indicators in the underwriting files; (2) determine whether the prior loan took place in the prior seven years; and (3) calculate the amount of the discount that should have been given. . . .

(emphasis added).

These findings are pivotal to the determination of whether there is predominance under the "circumstantial prior insured mortgage" theory forged by the trial court's order. STGC contends the statement in the trial court's order that "[STGC's] underwriting file will always contain the HUD-1 Statement, title commitment or the title report, title run, title policy and policy worksheet for the new transaction and a copy of the prior mortgage (deed of trust) being refinanced" is "patently incorrect" and unsupported by the record. Appellees respond in their brief in this Court that they "presented substantial evidence, described above, that a GF file contains the title policy, title commitment, HUD-1 settlement statement, and other relevant documents that can be used to identify class members." However, they do not specify where in their brief such evidence was described, nor do they specifically list "a copy of the prior mortgage (deed of trust)" as an item that is "always" in the underwriting file. We note that in appellees' "Statement of Facts" in their brief, they describe "standard form documents" they contend were involved in the transactions in question. Among their stated "facts," appellees assert in part "[t]he title agent has electronic access to the documents reflected in the title run and will typically view and save a copy of the existing mortgage on the property." In support of that statement, appellees cite (1) Ragland's "existing deed" from her prior mortgage transaction and

(2) excerpts from deposition testimony of Deal[20] and Rothermel.[21]  However, Deal's testimony pertains specifically to procedures and practices of TETRS for opening and maintaining title insurance files.  Therefore, Deal's testimony is not evidence as to what items are in files opened and maintained by other STGC agents.  Further, nothing identified by appellees shows Deal's or Rothermel's testimony supports the trial court's finding that the underwriting file "will always contain . . . a copy of the prior mortgage (deed of trust)."

Appellees assert in their brief in this Court that whether the original mortgage was a "first lien" in favor of an institutional lender, and therefore satisfies the third "proxy indicator," can be determined from the title commitment or title report.  However, even assuming without deciding that the evidence in the record supports that assertion, the record does not show that the

---

[20] Deal's cited testimony includes, in part, the following:

Q. So would the complete deed of trust be scanned or just the first page of the deed of trust be scanned if there were an existing mortgage on the property?

A. It varies by—it would vary by the different counties and how the information was obtained.
. . . .
Q. And does Exhibit 22, wouldn't that appear to be the first page of the deed of trust for that loan?

A. Yes.

Q. And it would have been the practice at TETRS to have pulled that up as part of the title examination and scanned it into the system for use in preparing the preliminary title report, correct?

A. Yes

[21] The portion of Rothermel's testimony cited by appellees includes the following:

Q. And when the examiner did the title search, they would input on schedule C the date of the existing mortgage, the original principal balance and the lender, correct?

A. That's the norm. They do enough to identify what document they're talking about.

Q. And typically when they do the examination, they would be able to see the actual deed of trust that's on file, correct?

A. That's recorded in the public records?

Q. Yes.

A. Yes.
. . . .
Q. You mentioned that you prefer to see the entire existing lien as opposed to the first page as part of the examination file; is that correct?

A. Yes.

Q. And so you would expect to see in a file that was appropriately prepared a copy of at least the first page, but perhaps the entirety of the existing lien as part of the file, correct?

A. Yes.

–31–

underwriting file "will always contain . . . the prior mortgage (deed of trust)," nor how the "HUD-1 Statement, title commitment or the title report, title run, title policy and policy worksheet for the new transaction" can be used to determine whether the original mortgage had a "GF number" or was "returned to a title company," i.e., two of the three "proxy indicators." Accordingly, we conclude the trial court's findings quoted above are not supported by the record and, consequently, the trial court's conclusions based on such findings are unfounded.

To correctly decide certification issues, a certifying court must "understand the claims, defenses, relevant facts, and applicable substantive law." *Bernal*, 22 S.W.3d at 435. While we do not question the analyses and conclusions of *Southwestern Bell* and *Young* as applied to the specific facts and claims in those cases, the claims, relevant facts, and applicable substantive law under the "circumstantial insured prior mortgage" theory in the case before us are virtually identical to those in *Ahmad*. *See Ahmad*, 690 F.3d at 700–01. The court in *Ahmad* stated in part that commonality was lacking in that case because "[e]ven if the proxy indicators constitute evidence from which a reasonable jury could conclude that a borrower's original mortgage was insured, the jury will have to engage in file-by-file review to determine whether individual plaintiffs had original mortgages covered by title insurance and met the other R–8 criteria." *Id.* at 704. We note again that appellees assert question number five in the trial court's order sets out the "common question" as to the "circumstantial prior insured mortgage theory," and that question "provides the underpinnings" for appellees' theory of predominance on this method of class proof. ("5. Whether the existence of one or more of the three proxy indicators in Class members' underwriting files proves, more likely than not, that Class members' prior mortgages were insured by lender's title policies?"). However, we conclude, on this record, that there is "no meaningful distinction" between the class certification issues in this case and those in *Ahmad*. *See id.* Accordingly, we conclude further appellees have not met their burden to show

predominance of questions common to members of the class with respect to the "circumstantial insured prior mortgage" theory. *See id*.; TEX. R. CIV. P. 42(b)(3); *see also Riemer*, 392 S.W.3d at 639 ("Because Rule 42 is patterned after Federal Rule of Civil Procedure 23, federal decisions and authorities interpreting current federal class action requirements are instructive.").

### 3. Predominance Under "Definitive Prior Insured Mortgage" Theory

Finally, we address STGC's challenge to predominance under the "definitive prior insured mortgage" theory.[22] According to STGC, such theory "is not even a proposal for class adjudication, as it would have the trial court adjudicate whether each borrower had a prior insured mortgage." Further, STGC contends (1) this theory would require "an individualized (and inherently unmanageable) search and examination of sources outside the refinance files" because a typical refinance file does not contain the HUD-l settlement statement from the prior mortgage or a copy of the lender's title insurance policy from the prior transaction and (2) the fact that such documents must be located and examined "shows that individual issues pervade this theory."

Appellees assert the "factual underpinning" for this theory is provided by question number six in the trial court's order: "Whether a HUD-1 Statement from the prior loan transaction showing the existence of a lender's title policy on the prior mortgage or the actual lender's title policy on the prior mortgage provides definitive, objective, and indisputable proof of the existence of a prior insured mortgage as required by Rate Rule R-8?" According to appellees,

> [Question number six] constitutes a question that can be definitively answered for all class members using a generalized set of facts and producing one unified conclusion. Either a HUD-1 statement from a prior loan transaction or an actual prior lender's title policy provides definitive, objective, and indisputable proof of

---

[22] *See* "Definitive Prior Insured Mortgage Theory" description in trial court's order, *supra* Part I.

the existence of a prior insured mortgage for every class member for whom it is shown, or it does not.

Further, appellees contend "the fact that gathering of individualized information and its presentation in summary form at trial is necessary in order to apply the class-wide holding to individual class members does not prevent commonality or predominance." In support of that argument, appellees cite *Young*. *See* 693 F.3d at 532.

As described above, the facts and claims in this case differ from those in *Young*, but are virtually identical to those in *Ahmad*. *See Ahmad*, 690 F.3d at 702–04; s*ee also Bernal*, 22 S.W.3d at 435 (to correctly determine certification issues, certifying court must "understand the claims, defenses, relevant facts, and applicable substantive law"). *Ahmad* did not involve the "definitive prior insured mortgage" theory or a question identical to question number six in the trial court's order. However, as described above, the court in *Ahmad* specifically addressed a question respecting what evidence constituted proof of a prior insured mortgage and concluded that question was not a "common question" because even if satisfaction of certain criteria constituted evidence from which a reasonable jury could conclude that a borrower's original mortgage was insured, "the jury will have to engage in file-by-file review to determine whether individual plaintiffs had original mortgages covered by title insurance and met the other R–8 criteria." *Ahmad*, 690 F.3d at 704.

In the case before us, the trial court stated in the "Litigation Plan" in its order

[I]f Plaintiffs elect to proceed under [the "definitive prior insured mortgage" theory], for every Class member for whom Plaintiffs can provide a HUD-1 settlement statement and/or actual lender's title insurance policy from a prior transaction occurring within seven years, then the Court will likely grant summary judgment with regard to those Class members. If need be, this evidence of the Class members for whom definite proof of a prior mortgage has been found can be presented to the jury in summary form.

If Plaintiffs proceed under this theory, after the Class members have been identified, Plaintiffs will attempt to obtain, by subpoena or otherwise, the HUD-1 settlement statements and/or prior insured title policies from the prior transactions. . . .

In its findings of fact, the trial court stated in part "it is undisputed from the record that a HUD-1 settlement statement from the prior loan transaction, or the actual lender's title policy from the prior transaction, are definitive, objective, and indisputable proof of a prior insured mortgage." Further, the trial court stated in its conclusions of law respecting predominance

> While the issues of which of [STGC's] underwriting files contain one or more [of] the three proxy indicators and, possibly, which Class members have HUD-1 settlement statements or prior lenders' title insurance policies definitely proving the existence of prior insured mortgages must be determined individually, those issues can be determined by reference to objective criteria through an essentially ministerial review of standard form documents and, therefore, can be handled in a manageable, time efficient, and fair manner.

It is fundamental that presenting evidence in a "summary form" would necessitate first locating and compiling the evidence to be summarized. The record shows that the documents in question, i.e. HUD-1 settlement statements and lender's title insurance policies from class members' *prior* mortgage transactions, are generally not in the possession of STGC. While the trial court stated in its conclusions of law that appellees "will attempt to obtain" such documents "by subpoena or otherwise," the trial court made no findings of fact as to the availability of such documents. Further, nothing in the record demonstrates how these documents could be located. Therefore, the trial court's conclusion that the existence of "HUD-1 settlement statements or prior lenders' title insurance policies definitely proving the existence of prior insured mortgages" can be "determined by reference to objective criteria through an essentially ministerial review of standard form documents and, therefore, can be handled in a manageable, time efficient, and fair manner" is not supported by the record. Accordingly, the "definitive prior insured mortgage" theory would require, as described by the court in *Ahmad*, a "file-by-file review to determine whether individual plaintiffs had original mortgages covered by title insurance and met the other R-8 criteria." *See id*. We conclude the record does not show that the requirements of rule 42(b)(3) were met as to the "definitive prior insured mortgage" theory. *See* TEX. R. CIV. P.

–35–

42(b)(3); *see also Stonebridge Life Ins. Co.*, 236 S.W.3d at 205 ("Actual conformance with Rule 42 is indispensable, and compliance with the rule must be demonstrated, not presumed.").

On this record, we conclude the trial court abused its discretion by concluding that the predominance requirements of rule 42(b)(3) were met as to the "proxy indicator," "circumstantial prior insured mortgage" and "definitive prior insured mortgage" theories. *See* TEX. R. CIV. P. 42(b)(3); *Doran*, 174 S.W.3d at 887.

We decide in favor of STGC on its third issue.

### III. CONCLUSION

We conclude appellees failed to satisfy the predominance requirements of rule 42(b)(3) with respect to all of the three theories described in the trial court's order. Therefore, the trial court abused its discretion by granting appellees' motion for class certification. We decide STGC's third issue in its favor. We need not address STGC's remaining issues.

We reverse the trial court's order granting class certification and remand this case to the trial court for further proceedings consistent with this opinion.


120534F.P05

Douglas Lang
DOUGLAS S. LANG
JUSTICE

–36–



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

STEWART TITLE GUARANTY
COMPANY, Appellant

No. 05-12-00534-CV       V.

JOHN MIMS, LUCY MIMS, AND HELEN
COTTON RAGLAND, INDIVIDUALLY
AND ON BEHALF OF ALL OTHERS
SIMILARLY SITUATED, Appellees

On Appeal from the 134th Judicial District
Court, Dallas County, Texas
Trial Court Cause No. 10-14112.
Opinion delivered by Justice Lang.   Justices
Bridges and Lewis participating.

In accordance with this Court's opinion of this date, the order of the trial court is
**REVERSED** and this cause is **REMANDED** to the trial court for further proceedings.

It is **ORDERED** that appellant STEWART TITLE GUARANTY COMPANY recover its
costs of this appeal from appellees JOHN MIMS, LUCY MIMS, AND HELEN COTTON
RAGLAND, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY
SITUATED.

Judgment entered this 19th day of June, 2013.

/Douglas S. Lang/
DOUGLAS S. LANG
JUSTICE

–37–