**REVERSE and RENDER; and Opinion Filed August 22, 2014.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-13-00370-CV

### TIERONE CONVERGED NETWORKS, INC., Appellant

### V.

### LAVON WATER SUPPLY CORPORATION, Appellee

On Appeal from the County Court at Law No. 5
Collin County, Texas
Trial Court Cause No. 005-00055-2013

## MEMORANDUM OPINION

Before Justices Bridges, Francis, and Lang-Miers
Opinion by Justice Lang-Miers

This is an appeal of a judgment awarding possession of leased premises to the landlord in a forcible detainer case. Appellant TierOne Converged Networks, Inc., the tenant, argues that the trial court erred by awarding possession of the property to Lavon Water Supply Corporation, the landlord, because TierOne exercised its option to renew the lease and was entitled to possession of the property. Because all dispositive issues are settled in law, we issue this memorandum opinion. TEX. R. APP. P. 47.2(a), 47.4. We reverse and render.

### BACKGROUND

On July 10, 2006, Lavon signed a lease agreement with Lavon Internet and Computer Services (Lavon Internet) for "the collocation of wireless communications equipment on the

water towers owned and operated by" Lavon. In September 2009, TierOne assumed the lease by assignment from Lavon Internet and agreed to comply with all terms and provisions of the lease.[1] The lease provided that "[t]he systems shall generally consist of four (4) sector antennas and wireless radios for wireless internet distribution and two (2) backhaul antennas and radios for the main feed of internet access" and that "Lessee's equipment to be installed shall be subject to reasonable approval of the Lessor."

Paragraph 2 of the lease stated:

> The initial term of this Letter Agreement for a wireless communication system shall be for a period of five (5) years beginning on the date of execution of this Letter Agreement. Provided Lessee is not in default, the lease term may be renewed by Lessee for subsequent te[r]ms of (5) years each, provided, however, that from and after the third (3) such renewal term, Lessor may terminate this lease by providing Lessee extra ninety (90) days prior written notice before any renewal term.

Paragraph 19 of the lease allowed Lavon to terminate the lease if TierOne committed an "event of default," including (1) not making payments within ten days of their due date and not remitting the payments within five days of receiving notice from Lavon and (2) not complying with any other term of the lease after receipt of written notice from Lavon, and not curing or commencing to cure that failure within thirty days of receiving notice and completing the cure within ninety days of the written notice. In addition, paragraph 20 provided that, at the termination of the lease, if TierOne was not in default, TierOne would have ninety days to remove its equipment and return the premises to its original condition. Paragraph 22 provided that, after five years, Lavon would give TierOne at least ninety days' written notice "in the event that the hardware should be removed and services terminated."

---

[1] Lavon asserts that, in 2008 and 2009, TierOne delayed in acknowledging the terms and obligations of the lease and did not make timely rental payments during numerous months. These alleged defaults are not at issue here.

The lease also required that "[a]ll notices, requests, claims, demands, and other communications hereunder shall be in writing and shall be deemed to have been duly given if delivered personally" by certain methods and addressed to the party.

On May 11, 2011—two months before the initial lease term expired on July 10, 2011—Lavon notified TierOne by letter that TierOne was over ten days late in paying Lavon $1,800 and that Lavon would exercise its right to terminate under paragraph 19 of the lease if TierOne did not send payment to Lavon within five days. Lavon's office manager, Camille Reagan, testified that TierOne paid Lavon the outstanding rent. In the May 11 letter, Lavon also notified TierOne that Lavon "may exercise its right" under paragraph 22 of the lease to terminate the lease ninety days after the expiration of the initial term, on October 8, 2011. Lavon stated that it would be soliciting bids for the right to lease its water towers for wireless communications and that TierOne would have the opportunity to bid, provided that it was not in default under the lease at the time that bids were taken.

On June 16, 2011, TierOne's chief financial officer Ron Celmer sent an e-mail to Herman Stork at Lavon regarding "Renewal of leases" and told him TierOne wanted to "begin new lease discussions[.]" He attached diagrams of the water towers and equipment on the towers. On July 7, 2011, Celmer sent two e-mails with a "proposed lease to replace the existing lease which expires on July 10, 2011" and diagrams of the towers. The negotiations were unsuccessful and the parties did not execute a new lease. After the end of the initial five-year term in July 2011, TierOne continued to make monthly payments of rent to Lavon and continued in possession of the leased property.

In April 2012, Lavon sent a proposed new lease agreement to TierOne and stated that if TierOne did not "respond to the contract" by June 10, 2012, TierOne must remove all equipment

from Lavon's premises.[2]  A month later, TierOne requested a thirty-day extension to "respond to the Water Tower Lease renewal proposed by Lavon[.]"

On June 8, 2012—eleven months after the initial term of the lease expired on July 10, 2011—TierOne stated in a letter to Lavon that it "consider[ed] itself to be in contract with Lavon . . . under Paragraph 2 of the" lease.  Six days later, on June 14, 2012, Lavon confirmed by letter that TierOne was "paid thru the end of June 2012 at th[at] point" but informed TierOne that it would not accept the last check that TierOne submitted as rental payment until TierOne and Lavon reached an agreement on the new lease.[3]  TierOne responded on August 9, 2012 that it was TierOne's "belief and position that TierOne Networks [was] not in breach" of the lease and that the lease was "still in full force and effect."  On August 17, 2012, Lavon stated by letter that TierOne "ha[d] in fact breached the Agreement on numerous occasions" and that, based on TierOne's letter from August 9, "it appears that [TierOne was] once again in violation of Paragraph 18 of the Agreement."[4]  Lavon also stated that, "[i]n any event," Lavon had notified TierOne by letter in May 2011 "of its intent to exercise its rights [to terminate the lease] under Paragraph 22" and that, "pursuant to Paragraph 22 of the Agreement, Lavon WSC hereby terminates the Agreement as of November 15, 2012" and "[p]ursuant to Paragraph 20 of the Agreement," TierOne must remove its equipment from the towers by November 15, 2012.

On November 16, 2012, Lavon notified TierOne that it must vacate the premises.  Lavon stated that "the initial term of the Lease expired on July 10, 2011, and the Lease was not renewed."  Lavon stated that "[t]hereafter, TierOne became a month-to-month tenant of the Premises."  Lavon gave TierOne three days to vacate the premises.

---

[2] Beginning with the April 2012 letter, correspondence to and from Lavon referred to Lavon Special Utility District.  As Lavon's witness Reagan explained, Lavon was "changing from a utility district from a [water supply corporation] at some point."

[3] Lavon's office manager Camille Reagan testified that TierOne continued to pay its rent to Lavon each month after June 2012, but that Lavon did not cash those checks.

[4] Paragraph 18 limited TierOne's right to assign the lease without Lavon's permission.

After TierOne did not vacate the property, Lavon filed a forcible detainer lawsuit in justice court seeking possession of the property. Lavon's complaint stated that "[t]he Lease was not renewed prior to its expiration and expired by its terms on July 10, 2011" and that "[t]hereafter, TierOne continued in possession of the Premises, making monthly rental payments to Lavon WSC." The justice court entered judgment for TierOne and Lavon appealed to the county court at law. After a bench trial, the county court at law entered judgment in favor of Lavon, granting Lavon immediate possession of the property. TierOne appealed.

In one issue, TierOne argues that "[t]he trial court erred by awarding possession of the property to Lavon based on an expired lease because TierOne exercised its option to renew the lease for five years."

## STANDARD OF REVIEW AND APPLICABLE LAW

When an appellant attacks the legal sufficiency of an adverse finding on an issue on which it did not have the burden of proof, the appellant must demonstrate there is no evidence to support the adverse finding. *See Exxon Corp. v. Emerald Oil & Gas, Co.*, 348 S.W.3d 194, 215 (Tex. 2011). We will sustain a no-evidence challenge on appeal if the record shows (1) a complete absence of evidence of a vital fact, (2) the court is barred by the rules of law or evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence conclusively establishes the opposite of a vital fact. *Serv. Corp. Int'l v. Guerra*, 348 S.W.3d 221, 228 (Tex. 2011). "Evidence is legally sufficient if it 'would enable reasonable and fair-minded people to reach the verdict under review.'" *Exxon Corp.*, 348 S.W.3d at 215 (quoting *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005)).

In a bench trial where no findings of fact or conclusions of law are requested or filed, the judgment implies all findings of fact necessary to support it. *Johnson v. Oliver*, 250 S.W.3d 182,

186 (Tex. App.—Dallas 2008, no pet.). But if the appellate record includes a clerk's record and a reporter's record, those implied findings are not conclusive and may be challenged for legal sufficiency on appeal. *Id.*

Additionally, when parties disagree over the meaning of an unambiguous contract, we must determine the parties' intent by considering and examining the entire writing in an effort to give effect to the parties' intentions as expressed in the contract. *Seagull Energy E&P, Inc. v. Eland Energy, Inc.*, 207 S.W.3d 342, 345 (Tex. 2006); *Ascendant Anesthesia PLLC v. Abazi*, 348 S.W.3d 454, 459 (Tex. App.—Dallas 2011, no pet.). "No single provision taken alone will be given controlling effect; rather, all the provisions must be considered with reference to the whole instrument." *Tawes v. Barnes*, 340 S.W.3d 419, 425 (Tex. 2011) (quoting *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983)). Only if a contract is first determined to be ambiguous may a court consider the parties' interpretation and admit extraneous evidence to determine the true meaning of the instrument. *Nat'l Union Fire Ins. Co. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995) (per curiam).

Finally, as a general rule, where a lease does not require any notice for renewal, a lessee's continued possession and payment of rent in accordance with the lease after the expiration of the primary term constitutes an election by the lessee to renew. *Willeke v. Bailey*, 189 S.W.2d 477, 481 (Tex. 1945); *Haltom City State Bank v. King Music Co.*, 474 S.W.2d 9, 11 (Tex. Civ. App.—Fort Worth 1971, writ ref'd n.r.e.); *see Fisher v. Church & Akin, L.L.C.*, No. 07-11-0495-CV, 2012 WL 5059548, at *3 (Tex. App.—Amarillo Oct. 16, 2012) (mem. op.), *rev'd in part on other grounds*, *Lubbock Cnty. Water Control & Improvement Dist. v. Church & Akin, L.L.C.*, No. 12-1039, 2014 WL 2994645, at *3–9 (Tex. July 3, 2014). But this general rule applies only "in the absence of an express or implied agreement to the contrary." *Haltom City*, 474 S.W.2d at 11; *see Willeke*, 189 S.W.2d at 481; *see also Nortex Foods, Inc. v. Burnett*, 278 S.W.2d 485, 487

(Tex. Civ. App.—Dallas 1955, no writ) (stating "general rule" that, when lease provides for notice to renew, "such notice is necessary to effect the renewal").

## Arguments of the Parties

### TierOne's Arguments

TierOne contends that it exercised its option to renew the lease for an additional five-year term under paragraph 2 of the lease and established its right to possession of the property because the lease did not contain a holding over provision or a provision requiring TierOne to submit notice to exercise the option to renew and because it was "undisputed" that TierOne remained in possession and paid its rent and that Lavon accepted the rent for a year after the end of the initial term. TierOne also argues that it was entitled to renew if it was not in default and there was no evidence that TierOne was in default at the time of renewal. TierOne contends that Lavon did not allege that TierOne was in default, but rather pleaded that the lease expired, and the trial court cannot award judgment based on an unpleaded theory.

In addition, TierOne argues that the notice provision in the lease only governs the form of notices already required by the lease. And TierOne contends that, because the lease did not require notice to renew, the general notice requirement governing the form of notices does not apply.[5]

TierOne additionally states that Lavon's monthly invoices were not evidence that the parties had a month-to-month agreement because Lavon invoiced TierOne monthly both during and after the initial term and the invoices "simply reflect[ed] that the rent was paid monthly[.]" And TierOne argues that negotiations between the parties concerning the terms of a new lease

---

[5] TierOne also argues that, even if the notice provision in the lease applied, TierOne exercised the option by continuing to pay rent in writing by check and because TierOne notified Lavon in writing that it had renewed the lease.

were not evidence that the initial lease was not renewed or in effect and that nothing in the record supports Lavon's argument that the parties agreed that the lease was not renewed.

**Lavon's Arguments**

Lavon argues that TierOne was in default of the lease at the time the first term expired because it "monopolized" available space on the towers "by doubling and tripling the amount of allowable equipment on the towers" without Lavon's approval as required by the lease. Lavon states that diagrams that TierOne provided in June 2011 and testimony by TierOne's former chief financial officer Celmer demonstrate that "TierOne had installed significantly more equipment on the towers than what was listed in the lease." It contends that Lavon's primary witness, Camille Reagan, testified that TierOne did not seek approval prior to placing additional equipment on the towers and that, although TierOne's witness "vaguely contradicted" this testimony, the contradicting testimony "is of no consequence for purposes of this Court's review" because this Court must resolve any inconsistency in testimony in favor of the trial court's judgment if a reasonable person could do so. Lavon contends that, as a result of this default, TierOne "never had the legal right to exercise the option to renew" because the lease allowed TierOne to renew the lease only if it was not in default.

Lavon also argues that TierOne's "mere payment of rent" after the initial term expired did not renew the lease because the lease contained a "broad and all-encompassing notice provision" that required any notice under the lease to be in writing and delivered personally to Lavon by certified mail, fax, or courier. Lavon contends that, because the renewal clause in the lease provided that the lease "may" be renewed, "the lease indicates that TierOne must take some action in order to renew the lease" and, "[a]t a minimum," the action "included informing Lavon that TierOne was exercising its option to renew the lease."

Lavon argues that there was more than a scintilla of evidence that Lavon and TierOne agreed that TierOne's continued possession and payment of rent would not renew the lease but rather that "TierOne would become a temporary month-to-month tenant while the new lease negotiations continued." Lavon states that it "sent TierOne a monthly invoice for temporary occupancy of the water towers during the lease negotiation process" and that "[e]ach invoice included a notation that TierOne's payment of the invoice would allow TierOne to continue to occupy the water towers for an additional thirty (30) days" and "TierOne would then submit payment after accepting the terms of the invoice."

Lavon contends that evidence supports this implied-in-fact agreement, including that TierOne did not mention renewal of the lease in its correspondence with Lavon towards the end of the initial term or during the year after expiration of the initial term. Lavon argues that it was an "abrupt change" when TierOne informed Lavon almost a year "after the expiration of the original lease" that TierOne considered the original lease renewed. Lavon states that, in response, it "immediately stopped accepting payments" from TierOne although it acknowledged that TierOne was paid through June 2012 "in keeping with the parties' temporary arrangement." Lavon argues that, because whether an agreement existed between the parties is generally a question of fact, and because the evidence was conflicting, we must presume that the trial court decided that "the parties reached an agreement that TierOne was not renewing the lease by continuing in possession or by making rental payments after the lease expired," and instead that they agreed that TierOne "would become a temporary month-to-month tenant while the new lease negotiations continued." Lavon argues that, as a result, the lease was not renewed and Lavon was entitled to immediate possession of the leased property.

**Analysis**

**Was Notice Required?**

TierOne contends the lease did not expire because it renewed the lease by continuing to pay rent and staying in possession. And Lavon argues the lease expired because the general notice provision in paragraph 24 and the renewal provision in paragraph 2 of the lease must be read together and required TierOne to give Lavon notice of renewal. We do not agree with Lavon.

Paragraph 2 of the lease provided that, if TierOne is not in default, "the lease term may be renewed by Lessee for subsequent te[r]ms of (5) years each[.]" The general notice provision in paragraph 24 applied to all "notices . . . hereunder" and required that notices be in writing and delivered personally. The cases that Lavon cites involve lease provisions that required notice in order to renew or state the general rule that, in the absence of a formal notice provision, continuing in possession by paying rent constituted an election to renew. *See Willeke*, 189 S.W.2d at 481 ("Since the contract did not require formal notice, the fact that respondents so continued in possession was enough."); *Fisher*, 2012 WL 5059548, at *3 (noting that lease, like the lease in *Willeke*, did not require notice to exercise the option to extend); *Nortex Foods*, 278 S.W.2d at 487 (noting that lease provided for renewal "'at the same price and upon the same terms by notifying lessor thirty (30) days in advance of the termination date of such lease'"). But here, the notice provision in paragraph 24 did not state that it applied to the renewal provision in paragraph 2, and paragraph 2 did not include a notice requirement for TierOne to renew. We note that, in contrast, this same provision required lessor—after the third renewal term—to give lessee ninety days' prior written notice before a renewal term if it wanted to terminate the lease. The absence of any notice requirement in part of this paragraph and presence of a prior written notice requirement in another part indicates the difference was intentional. *See Seagull Energy*,

207 S.W.3d at 345 (stating that a court must determine the intent of the parties as expressed in a contract by examining and considering the entire writing in an effort to harmonize and give effect to all of the contract provisions); *Ascendant Anesthesia*, 348 S.W.3d at 459 ("The parties' intent must be taken from the agreement itself, and the agreement must be enforced as written.").

As a result, because the lease did not require any notice or involve any other "express or implied agreement to the contrary[,]" the general rule applies that TierOne's continued possession of the leased property and payment of rent in accordance with the lease after the expiration of the initial term constituted an election to renew. *Haltom City*, 474 S.W.2d at 11; *see Willeke*, 189 S.W.2d at 481.

**Did Lavon Prove Default?**

Lavon argues that we may affirm the judgment because TierOne was in default when the first term of the lease expired and it was not entitled to renew the lease. Lavon argues that TierOne was in default because it placed equipment on the towers without Lavon's approval. And TierOne argues that Lavon did not plead or prove it was in default, that it was not in default, and there was no evidence of default.[6]

The lease provided that "Lessee's equipment to be installed shall be subject to reasonable approval of the Lessor." Lavon contends that this language gave it the right to approve any additional equipment that might be installed on the water towers prior to installation and imposed a mandatory duty on TierOne to seek Lavon's approval prior to installing any additional equipment. TierOne argues that this language does not require approval prior to the installation of any additional equipment. We agree with TierOne.

The lease did not state that TierOne had to obtain approval prior to installing any additional equipment on the towers. Lavon offered Reagan's testimony that it was her

---

[6] Because of our resolution of this issue, we do not address TierOne's argument that Lavon did not plead that TierOne was in default.

–11–

"understanding" that "Tierone was supposed to ask for authorization before it installed equipment on Lavon WSC water towers" and that, "to [her] knowledge," TierOne did not "ever ask for permission" to install additional equipment on Lavon's water towers. But Reagan's understanding of the lease terms cannot supplant the plain language of the lease. *See Nat'l Union Fire Ins. Co.*, 907 S.W.2d at 520; *Ascendant Anesthesia*, 348 S.W.3d at 459. And the lease did not specify whether the approval had to be obtained prior to installation or could be sought after installation. Additionally, Reagan testified that, to her knowledge, TierOne did not ask for permission to install additional equipment before the installation, but she did not testify that TierOne did not obtain approval at some other time. We conclude that Lavon presented less than a scintilla of evidence that TierOne was in default at the time the initial term expired.

**Was There an Implied Agreement for a Month-to-Month Term?**

TierOne argues that it renewed the lease and the parties did not have an agreement that TierOne was a month-to-month tenant after the initial term. Lavon argues that there was more than a scintilla of evidence that Lavon and TierOne agreed that TierOne would become a month-to-month tenant during lease negotiations after the expiration of the initial term. Lavon states that it "sent TierOne a monthly invoice for temporary occupancy of the water towers during the lease negotiation process" and that the invoices included a notation that TierOne's payment "would allow TierOne to occupy the water towers for an additional thirty (30) days." But the record only contains invoices that Lavon sent to TierOne during the initial term for February 2009 and February through May 2011 and does not contain any invoices from the period after the initial lease term ended on July 10, 2011. These invoices during the initial term bill TierOne for a month's rent. Lavon's office manager Reagan testified that, after the initial term, Lavon also sent invoices to TierOne for a month's rent. Consequently, there is no evidence in the record that the parties' relationship changed after the initial term.

–12–

Lavon also cites general authority that an implied-in-fact contract arises from the parties' acts and conduct. *See Stewart Title Guar. Co. v. Mims*, 405 S.W.3d 319, 338 (Tex. App.— Dallas 2013, no pet.). But Lavon has not cited any authority supporting its position that ongoing negotiations for a new lease are evidence that the current lease is not renewed or in effect.

We conclude that there is no evidence in the record to support Lavon's argument that the parties entered into an implied, temporary, month-to-month agreement after the expiration of the initial term of the lease.

We sustain TierOne's issue.

## CONCLUSION

We reverse the judgment of the trial court and render judgment that Lavon take nothing in its forcible detainer claim against TierOne.

/Elizabeth Lang-Miers/
ELIZABETH LANG-MIERS
JUSTICE

130370F.P05

–13–



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

TIERONE CONVERGED NETWORKS, INC., Appellant

No. 05-13-00370-CV       V.

LAVON WATER SUPPLY CORPORATION, Appellee

On Appeal from the County Court at Law No. 5, Collin County, Texas
Trial Court Cause No. 005-00055-2013.
Opinion delivered by Justice Lang-Miers, Justices Bridges and Francis participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **REVERSED** and judgment is **RENDERED** that appellee Lavon Water Supply Corporation take nothing in its forcible detainer claim against appellant TierOne Converged Networks, Inc.

It is **ORDERED** that appellant TierOne Converged Networks, Inc. recover its costs of this appeal from appellee Lavon Water Supply Corporation.

Judgment entered this 22nd day of August, 2014.